Slip Op. 15-148

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| NAN YA PLASTICS CORPORATION, LTD., | : | |
| *Plaintiff,* | : | |
| v. | : | |
| UNITED STATES, | : | Court No. 13-00097 |
| *Defendant,* | : | |
| and | : | |
| DUPONT TEIJIN FILMS, MITSUBISHI POLYESTER FILM, INC., and SKC, INC., | : | |
| | : | |
| *Defendant-Intervenors.* | | |

[Denying Plaintiff's Motion for Judgment on the Agency Record]

Dated:  December 31, 2015

Peter J. Koenig, Squire Patton Boggs LLP, of Washington, D.C., argued for Plaintiff.

Jane C. Dempsey, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Melissa M. Devine, Trial Attorney.  Of counsel on the brief was Michael T. Gagain, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

David M. Horn, Ronald I. Meltzer, Patrick J. McLain, and Jeffrey I. Kessler, Wilmer, Cutler, Pickering, Hale and Dorr, LLP, of Washington, D.C., for Defendant-Intervenors.

# OPINION

RIDGWAY, Judge:

In this action, Plaintiff Nan Ya Plastics Corporation, Ltd. ("Nan Ya") – a Taiwanese

producer and exporter of polyethylene terephthalate film, sheet, and strip ("PET film") –

contests the final results of the U.S. Department of Commerce's 2010-2011 administrative review of the antidumping duty order covering PET film from Taiwan.  *See* Polyethylene Terephthalate Film, Sheet, and Strip From Taiwan: Final Results of Antidumping Duty Administrative Review; 2010-2011, 78 Fed. Reg. 9668 (Feb. 11, 2013) ("Final Results"), *amended by* Polyethylene Terephthalate Film, Sheet, and Strip From Taiwan: Notice of Correction to the Final Results of the 2010-2011 Antidumping Duty Administrative Review, 78 Fed. Reg. 14,266 (March 5, 2013) (correcting wrong case number identified in Final Results); *see also* Issues and Decision Memorandum for the Final Results of the 2010-2011 Antidumping Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan (Feb. 4, 2013) ("Issues & Decision Memorandum").

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which Nan Ya challenges Commerce's application of the "average-to-transaction" ("A-T") comparison methodology in its review of Nan Ya's U.S. sales, based on the agency's finding that Nan Ya engaged in "masked" or "targeted" dumping.  *See generally* Brief of Nan Ya Plastics Corporation, Ltd. in Support of Its Motion for Judgment Upon the Agency Record ("Pl.'s Brief"); Reply Brief of Plaintiff Nan Ya in Support of Its Motion for Judgment on the Agency Record ("Pl.'s Reply Brief").[1]  Pointing to record evidence indicating that differences in the prices that Nan Ya charged for PET film during the period of review correlated with fluctuations in the cost of raw materials that the company used to produce its merchandise,

---

[1]In the international trade community, the terms "masked" dumping and "targeted" dumping are used interchangeably.

the gravamen of Nan Ya's claim is that Commerce erred by failing to consider such evidence in its targeted dumping analysis. *See*, *e.g.*, Pl.'s Brief at 17 (asserting that Commerce improperly "refused to consider undisputed evidence that the price differences in this case simply reflect differences in raw material costs – and not selective pricing"); *see generally* Pl.'s Brief at 1, 2, 3-4, 14-25, 31; Pl.'s Reply Brief, *passim*.

The Government maintains that the relevant part of the statute requires only that Commerce determine "*if* there [was] a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." Defendant's Opposition to Plaintiff's Motion for Judgment upon the Agency Record at 15 ("Def.'s Response Brief") (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i) (emphasis added)).[2] According to the Government, "Nan Ya's explanation for *why* there was a pattern of prices that differed significantly among time periods and customers was not relevant" to Commerce's targeted dumping inquiry. Def.'s Response Brief at 15 (emphasis added); *see generally id.* at 1, 4-5, 14-28, 47. The Defendant-Intervenors – DuPont Teijin Films, Mitsubishi Polyester Film, Inc., and SKC, Inc. ("Domestic Producers") – similarly defend Commerce's interpretation of the statute, as well as the agency's targeted dumping analysis and its use of the A-T comparison methodology in reviewing Nan Ya's U.S. sales. *See generally* Defendant-Intervenors' Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record at 1, 5-7, 10 ("Def-Ints.' Response Brief").

---

[2]All citations to statutes herein are to the 2006 edition of the United States Code. The pertinent text remained the same at all times relevant herein.

Jurisdiction lies under 28 U.S.C. § 1581(c).  For the reasons set forth below, Nan Ya's

Motion for Judgment on the Agency Record must be denied.

## I.  <u>Background</u>

At issue here are the Final Results of the 2010-2011 administrative review of the

antidumping duty order covering PET film from Taiwan, in which Commerce calculated Nan

Ya's dumping margin using the agency's "average-to-transaction" ("A-T") comparison

methodology, based on findings made by the agency in its targeted dumping analysis.  *See*

*generally* Issues & Decision Memorandum at 3-14 (comment 1); *see also* Final Results, 78

Fed. Reg. at 9668, 9669 (referring to targeted dumping analysis and application of A-T

methodology).

"Dumping occurs when imported merchandise is sold for a lower price in the United

States than it is sold in its home market."  <u>Union Steel v. United States</u>, 713 F.3d 1101, 1103

(Fed. Cir. 2013).   Under the antidumping statute, Commerce is required to impose

antidumping duties on imported merchandise that "is being, or is likely to be, sold in the

United States at less than its fair value" when the relevant domestic industry is materially

injured or threatened with material injury.  19 U.S.C. § 1673.  The purpose of imposing such

antidumping duties is to offset the negative effects of dumping.  *See generally* <u>Sioux Honey</u>

<u>Ass'n v. Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1046-47 (Fed. Cir. 2012) (explaining that

"dumping presents unfair competition concerns because foreign companies selling goods

below fair value can undercut domestic producers selling those same goods at market prices").

Under the statute, Commerce calculates a respondent's dumping margin – to establish the extent of the antidumping duties to be imposed – by determining the "amount by which the normal value [*i.e.*, home market price] exceeds the export price or constructed export price [*i.e.*, U.S. price] of the subject merchandise." 19 U.S.C. § 1677(35)(A).  The statute and the regulations identify three methods for comparing normal value to export price or constructed export price:   (1) the average-to-average ("A-A") comparison methodology, (2) the transaction-to-transaction ("T-T") comparison methodology, and (3) the average-to-transaction ("A-T") comparison methodology, which was the methodology that Commerce applied in calculating Nan Ya's dumping margin in the administrative review at issue here. *See* 19 U.S.C. § 1677f-1(d)(1)[3]; 19 C.F.R. § 351.414(b)(1)-(3) (2012)[4]; JBF RAK LLC v.

---

[3]Although 19 U.S.C. § 1677f-1(d)(1) is titled "Investigations," the comparison methodology that Commerce applies in administrative reviews parallels its methodology in investigations.  *See* Issues & Decision Memorandum at 7-8 (comment 1-A).  The Court of Appeals has held that Commerce's approach is reasonable.  *See* JBF RAK LLC v. United States*, 790 F.3d 1358, 1362-65 (Fed. Cir. 2015) (ruling that Commerce did not abuse its discretion in basing its practice in administrative reviews on its practice in investigations, including application of targeted dumping analysis and use of A-T comparison methodology where appropriate; holding, *inter alia*, that "Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable").

[4]Except as otherwise indicated, all citations to regulations herein are to the 2012 edition of the Code of Federal Regulations; and all such citations are to subsections of 19 C.F.R. § 351.414.  That regulation was significantly revised in 2012, with the revisions made applicable to all segments of antidumping duty proceedings in which preliminary determinations issued after April 16, 2012 (including the administrative review at issue in this action).  *See generally* Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101 (Feb. 14, 2012).  The only revisions relevant here are those to 19 C.F.R. § 351.414(c)(1) and (c)(2).  Immediately prior to revision, those subsections provided:

United States, 790 F.3d 1358, 1364 (Fed. Cir. 2015) (recognizing the three comparison methodologies, *i.e.*, A-A, T-T, and A-T).

In administrative reviews, Commerce typically uses the A-A methodology, comparing the weighted-average of the normal values to the weighted-average of the export prices or constructed export prices for comparable merchandise. *See* 19 U.S.C. § 1677f-1(d)(1)(A)(i);

_____

(c) *Preferences*.  (1) In an investigation, [Commerce] normally will use the average-to-average method.  [Commerce] will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.

(2) In a review, [Commerce] normally will use the average-to-transaction method.

As revised, the subsections read:

(c) *Choice of method*.  (1) In an investigation or review, [Commerce] will use the average-to-average method unless [Commerce] determines another method is appropriate in a particular case.

(2) [Commerce] will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.

For purposes of this case, there are two noteworthy changes.  First, before revision, the default comparison methodology in administrative reviews was A-T, whereas, post-revision, the default in administrative reviews became A-A.  And, second, post-revision, the regulation expressly provides for Commerce's use of a methodology other than A-A (such as the A-T methodology) in both investigations and administrative reviews, if Commerce determines that use of another methodology is "appropriate."  For additional background on the 2012 revisions to 19 C.F.R. § 351.414, *see* Timken Co. v. United States, 38 CIT ____, ____, 968 F. Supp. 2d 1279, 1281-82 (2014).

19 C.F.R. § 351.414(b)(1); *see also* 19 C.F.R. § 351.414(c)(1) (providing that, in both investigations and administrative reviews, agency "will use the average-to-average method unless the [agency] determines another method is appropriate in a particular case").   In contrast, when using the A-T methodology, Commerce compares the weighted average of the normal values to the export prices or constructed export prices in individual transactions.  19 U.S.C. § 1677f-1(d)(1)(B); 19 C.F.R. § 351.414(b)(3).[5]

The statute authorizes Commerce to use the A-T comparison methodology as an exception to the other two methodologies.  *See* 19 U.S.C. § 1677f-1(d)(1)(B).  Specifically, Commerce may use the A-T methodology in cases involving "masked" or "targeted" dumping – that is, where a respondent sells its goods in the United States at dumped prices "to particular customers or regions [or at particular times], while selling at higher prices to other customers or regions [or at other times]."   *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 842-43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177-78.  When a respondent's sales are structured in this fashion, use of the A-A methodology may understate actual dumping by measuring average dumping over

---

[5]When using the T-T comparison methodology, Commerce compares the normal values for individual transactions to the export prices or constructed export prices for individual transactions involving comparable merchandise. 19 U.S.C. § 1677f-1(d)(1)(A)(ii); 19 C.F.R. § 351.414(b)(2).   However, the T-T methodology is used "only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 842-43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 (similar); U.S. Steel Corp. v. United States, 621 F.3d 1351, 1358 n.3 (Fed. Cir. 2010) (similar).

the review period as a whole, while masking dumping from discrete, specific targeted sales. In contrast, use of the A-T methodology unmasks such dumping by, among other things, determining a dumping margin for each individual sale.  *See*, *e.g.*, <u>Koyo Seiko Co. v. United States</u>, 20 F.3d 1156, 1159 (Fed. Cir. 1994) (explaining "masked dumping," and noting that, "[b]y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps [its] product intermittently – sometimes selling below the foreign market value and sometimes selling above it," which is pricing behavior generally not captured by Commerce's A-A methodology).[6]

Pursuant to the statute, Commerce may use the A-T methodology where (i) "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) [Commerce] explains why such differences cannot be taken into account" using one of the other methodologies.  19

---

[6]As the court explained in <u>Apex Frozen Food</u>:

Congress enacted § 1677f-1(d)(1)(B) to combat a type of dumping that is difficult to remedy.  When exporters target their sales, those sales may disproportionately affect U.S. producers who sell to particular customers or regions or in specific time periods. . . . Nonetheless, if exporters counterweight their targeting with above-fair-value sales, then A-A, which averages export prices and offsets negative margins, could yield an understated antidumping rate.  *See* <u>Union Steel v. United States</u>, 713 F.3d 1101, 1108 (Fed. Cir. 2013) (holding A-A with offsets "masks individual transaction prices below normal value").  Yet A-T neither averages export prices nor offsets.  This approach ensures that the final rate reflects every instance of dumping, even if an exporter balanced its targeting with above-fair-value sales.

<u>Apex Frozen Food Private Ltd. v. United States</u>, 38 CIT ____, ____, 37 F. Supp. 3d 1286, 1296 (2014).

U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).   At the time of the administrative review at issue here,

Commerce applied the so-called "Nails test" to determine whether the "pattern" and

"significant difference" criteria of 19 U.S.C. § 1677f-1(d)(1)(B)(i) were satisfied.  *See*, *e.g.*,

Issues & Decision Memorandum at 9, 10.[7]  The Nails test (which has since been supplanted

by what is known as Commerce's "differential pricing analysis") consisted of two statistical

analyses: the "standard deviation test" and the "price gap test."  *See* JBF RAK*, 790 F.3d at

1367-68 & n.5 (summarizing the Nails test's "two-step analysis"); Proposed Methodology for

Identifying and Analyzing Targeted Dumping in Antidumping Investigations; Request for

Comment, 73 Fed. Reg. 26,371, 26,732 (May 9, 2008) (same).[8]

---

[7]The "Nails test" is named for the first proceedings in which it was employed.  *See generally* Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value, 73 Fed. Reg. 33,985, 33,985-86 (June 16, 2008) and accompanying Issues & Decision Memorandum at 2-3, 11-22 (June 6, 2008) (comments 2-7) (explaining that, in review at issue, Commerce developed and implemented a new methodology, *i.e.*, the Nails test, to analyze allegations of targeted dumping); Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 33,977, 33,977 (June 16, 2008) ("Nails from China") and accompanying Issues & Decision Memorandum at 4, 12-23 (June 6, 2008) (comments 2-7) (same).

For a more detailed explanation of the Nails test, *see*, *e.g.*, Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations; Request for Comment, 73 Fed. Reg. 26,371, 26,731-32 (May 9, 2008); *see also* JBF RAK*, 790 F.3d at 1367-68 & n.5 (discussing, with approval, the Nails test); Mid Continent Nail Corp. v. United States, 34 CIT 512, 518-21, 712 F. Supp. 2d 1370, 1376-79 (2010) (in action reviewing Commerce's determination in Nails from China (*supra*), rejecting attacks on the then-newly-announced Nails test and holding application of the test in targeted dumping analysis to be "reasonable").

[8]The Government notes that the Nails test was modified in certain respects in Multilayered Wood Flooring from China, but that the modification is not relevant to this case.  *See* Def.'s Response Brief at 15 & n.5 (citing Multilayered Wood Flooring From the People's

If Commerce identifies a pattern of export prices or constructed export prices that

differ significantly among purchasers, regions, or periods of time (whether through the Nails

test or the newer differential pricing analysis), Commerce then considers whether the A-A

comparison methodology can account for the observed price differences.  *See* 19 U.S.C. §

1677f-1(d)(1)(B)(ii).  In making that determination, Commerce evaluates whether there is a

"meaningful difference" between the results of the application of the A-A methodology and

the results of the application of the A-T methodology.  *See generally* Issues & Decision

Memorandum at 11; Apex Frozen Food Private Ltd. v. United States, 38 CIT ____, ____,

---

Republic of China:  Final Determination of Sales at Less Than Fair Value, 76 Fed. Reg. 64,318 (Oct. 18, 2011) and accompanying Issues & Decision Memorandum at 28-36 (Oct. 11, 2011) (comment 4)).

More recently, Commerce has replaced its "targeted dumping analysis" (including the two-step Nails test) with a new "differential pricing analysis." *See generally*, *e.g.*, Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720, 26,722-23 (May 6, 2014); Golden Dragon Precise Copper Tube Group v. United States, 39 CIT ____, ____, 2015 WL 4927515 * 2-3, 7-8 (2014); Xantham Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 Fed. Reg. 33,351, 33,352 (June 4, 2013) (noting Commerce's use of "a differential pricing analysis to determine the comparison method [*i.e.*, A-A or A-T], rather than the targeted dumping test") and accompanying Issues & Decision Memorandum at 17-31 (May 28, 2013) (comment 3).

Instead of the Nails test (consisting of the "standard deviation test" and the "price gap test"), Commerce now uses the "Cohen's *d* test" and the "ratio test" to determine whether there is a pattern of prices that differ significantly.  *See* Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. at 26,722-23; Golden Dragon, 39 CIT at ____, 2015 WL 4927515 * 2.  Further, in addition to revising how Commerce determines whether there exists a pattern of prices that differ significantly (*see* 19 U.S.C. § 1677f-1(d)(1)(B)(i)), Commerce's new differential pricing analysis also modifies how the agency determines whether use of the A-A comparison methodology can account for observed price differences (*see* 19 U.S.C. § 1677f-1(d)(1)(B)(ii)) – that is, whether use of the A-T methodology "yields a meaningful difference" relative to use of the A-A methodology.  *See* Differential Pricing Analysis: Request for Comments, 79 Fed. Reg. at 26,723.

____, 37 F. Supp. 3d 1286, 1292, 1293-1301 (2014) (discussing "meaningful difference" analysis, and addressing claims contesting agency's "meaningful difference" analysis).  If Commerce finds a "meaningful difference," the agency, in its discretion, may apply the A-T methodology in reviewing the U.S. sales of the respondent in question.  *See* Issues & Decision Memorandum at 11.

After Commerce initiated the administrative review at issue here, but shortly before the Preliminary Results were released, several of the petitioners (including two of the Domestic Producers that have intervened in this action) filed allegations that Nan Ya had engaged in targeted dumping during the period of review.  *See* Letter from Domestic Producers to Commerce (July 17, 2012) (Pub. Doc. No. 115).[9]  Given the press of time, Commerce decided not to conduct a targeted dumping analysis in reaching its Preliminary Results, and calculated Nan Ya's preliminary dumping margin as 5.20% using the A-A comparison methodology.  Polyethylene Terephthalate Film, Sheet, and Strip From Taiwan: Preliminary Results of Antidumping Duty Administrative Review, 77 Fed. Reg. 46,704, 46,705, 46,711 (Aug. 6, 2012) ("Preliminary Results").  However, the Preliminary Results signaled Commerce's "inten[t] to continue to consider . . . whether [application of the A-T

---

[9]The administrative record in this action includes confidential (*i.e.*, business proprietary) information.  Accordingly, like the record itself, the index to the administrative record consists of two sections – one identifying the public documents and the other identifying the documents that include confidential information.  Only documents in the public record are cited herein; and they are noted as "Pub. Doc. No. ____."

methodology] [would be] appropriate in [this] administrative review[]."  *Id.*, 77 Fed. Reg. at 46,705.

        In a different context, Commerce acknowledged in the Preliminary Results that Nan Ya "experienced significant changes" in its cost of production due to volatility in the prices of certain primary inputs.  Preliminary Results, 77 Fed. Reg. at 46,708 (explaining agency's decision to use a "quarterly costing approach" – in lieu of the standard practice of calculating an annual weighted-average cost of production – in determining Nan Ya's cost of production for purposes of the Preliminary Results).  Commerce further acknowledged that there appeared to be a "reasonable correlat[ion]" between the fluctuations in Nan Ya's production costs and changes in the prices charged by the company.  *Id.*

        After the Preliminary Results issued, Commerce conducted a Post-Preliminary Analysis to address the Domestic Producers' allegations of targeted dumping.  *See* 2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan: Post-Preliminary Analysis and Calculation Memorandum of Nan Ya Plastics Corporation, Ltd. and Shinkong Synthetic Fibers Corporation and its Subsidiary Shinkong Materials Technology Co. Ltd. (Dec. 21, 2012) (Pub. Doc. No. 143) ("Post-Preliminary Analysis Memorandum"); Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan – Post-Preliminary Results Analysis Memo for Nan Ya Plastics Corporation, Ltd. at 1 (Dec. 21, 2012) (Pub. Doc. No. 145) ("Post-Preliminary Results Memo for Nan Ya").

Applying the <u>Nails</u> test to Nan Ya's U.S. sales, Commerce found a pattern of prices that differed significantly by time period. *See* Issues & Decision Memorandum at 5 (noting that Post-Preliminary Analysis focused only on time period); Def.'s Response Brief at 3; Post-Preliminary Analysis Memorandum at 3. Commerce further found that there was "a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average method [as compared to] the average-to-transaction method," and therefore concluded that use of the A-A comparison methodology could not account for Nan Ya's observed price differences. Post-Preliminary Analysis Memorandum at 3-4. Accordingly, Commerce applied the A-T comparison methodology and calculated a revised dumping margin of 9.15% for Nan Ya. Post-Preliminary Results Memo for Nan Ya at 1.

In its administrative case brief filed with the agency, Nan Ya disputed Commerce's finding of targeted dumping in its Post-Preliminary Analysis and the agency's use of the A-T comparison methodology in calculating Nan Ya's dumping margin. *See generally* Nan Ya Comments on Preliminary Decisions at 1, 3-13 (Jan. 10, 2013) (Pub. Doc. No. 162) ("Nan Ya's Administrative Case Brief"). Among other things, Nan Ya emphasized the existence of uncontroverted evidence on the administrative record indicating that changes in Nan Ya's prices correlated with fluctuations in the cost of raw materials used to produce the company's merchandise, together with Commerce's own observations to the same effect in the Preliminary Results. *Id*. at 1, 3-5; *see also* Preliminary Results, 77 Fed. Reg. at 46,708 (concluding, *inter alia*, that "the quarterly cost and quarterly sales prices for . . . Nan Ya appear to be reasonably correlated").

Much like Commerce's Post-Preliminary Analysis Memorandum, the agency's Final Results reflected the application of the <u>Nails</u> test to Nan Ya's U.S. sales, finding a pattern of prices that differed significantly by time period and by purchaser.  *See* Issues & Decision Memorandum at 6, 10-12.  Similarly, Commerce again determined that use of the A-A comparison methodology could not account for the observed differences in Nan Ya's prices. *Id*. at 6, 11-12.  Commerce therefore continued to apply its A-T comparison methodology in analyzing Nan Ya's U.S. sales for purposes of the Final Results.  *Id*. at 6, 12.

Underscoring the language of the statute, Commerce made short work of Nan Ya's argument that the agency's targeted dumping findings were "undermined by the observation that [fluctuations] in the costs of raw material[s] account for differences in Nan Ya's pricing . . . over time."  Issues & Decision Memorandum at 12.  Commerce reasoned that the statute on its face requires only that the agency consider whether there is a pattern of prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, and, if such a pattern exists, to explain why such differences cannot be taken into account using a methodology other than the A-T methodology.  *Id*. (citing 19 U.S.C. § 1677f-1(d)(1)(B)).  As such, Commerce concluded that the statute "does not require [the agency] to discern *why* such [pricing] patterns arise," and that nothing obligated the agency "to consider whether changes in [Nan Ya's] raw material costs caused the pattern" that the agency observed.  *Id*. (emphasis added).

The Final Results assigned Nan Ya a dumping margin of 8.99%.  *See* Final Results,

78 Fed. Reg. at 9669.  This action ensued.[10]

---

[10]Nan Ya's claims have changed significantly during the pendency of this action.  The Complaint that Nan Ya filed in this matter challenged the Final Results only generally, objecting broadly to Commerce's "findings regarding targeted dumping and zeroing."  *See* Complaint ¶ 9.  Nan Ya later stated four more specific claims, including the claim that it presses here.  *See* [Plaintiff's] Response to Motion for More Definitive Statement at ¶ 1 (asserting that Commerce improperly "ignore[d] cost trends" in finding "a pattern of export prices for comparable merchandise that differ significantly over time periods and purchasers" as part of the agency's targeted dumping analysis); *id*. ¶ 2 (contesting Commerce's "use of the average-to-transaction methodology even as to sales where no targeted dumping is found"); *id*. ¶ 3 (asserting that Commerce is not permitted to use its A-T comparison methodology in administrative reviews); *id*. ¶ 4 (protesting Commerce's use of invoice date – rather than purchase order date – to determine date of sale).

Nan Ya's opening brief argued two claims in addition to the claim that remains at issue.  In particular, Nan Ya's opening brief reiterated the company's claim that the statute permits Commerce to engage in targeted dumping analyses only in initial antidumping investigations, and not in administrative reviews such as the review at issue here.  *See* Pl.'s Brief at 1, 2, 11-13.  In addition, Nan Ya's opening brief argued that Commerce violated the Administrative Procedures Act by the agency's 2008 withdrawal of its "Limiting Rule" (then codified at 19 C.F.R. § 351.414(f)(2)), which provided, in relevant part, that – where Commerce found targeted dumping – it would "normally" "limit the application of the average-to-transaction method to those sales that constitute targeted dumping."  *See* Pl.'s Brief at 1, 3, 4, 6-7, 25-30.  Ultimately, however, Nan Ya abandoned both of those claims, leaving only the claim that is addressed here – that is, Nan Ya's claim that, in Commerce's targeted dumping analysis, the agency should have considered evidence indicating that differences in the prices that Nan Ya charged for PET film correlated with fluctuations in the cost of inputs that the company used to produce its merchandise, and thus (according to Nan Ya) did not constitute targeted dumping.  *See* Pl.'s Reply Brief at 1 n.2 (abandoning claim "that targeted dumping cannot be done in administrative reviews," as well as claim "that the [Administrative Procedure Act] was violated" by Commerce's 2008 withdrawal of its Limiting Rule).

Nan Ya attempted to raise a number of new claims in its reply brief.  For example, in its reply brief, Nan Ya – for the first time – challenged Commerce's determination that use of the agency's A-A comparison methodology could not account for the observed differences in Nan Ya's prices.  *See, e.g.*, Pl.'s Reply Brief at 7-8 (arguing that "Commerce simply *assumes*, without more, that just because the A-T method yields a higher dumping margin than the A-A method, . . . the A-A method does not take into account pricing differences"); *see generally*

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's

determination must be upheld except to the extent that it is found to be "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §

1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed.

Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal

Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,

1380 (Fed. Cir. 2008) (same).

Moreover, any determination as to the substantiality of the evidence "must take into

account whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn."  Suramerica de

Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting

---

*id*. at 7-8, 9, 13.  As another example, Nan Ya's reply brief – for the first time – argued the issue of "zeroing" (*i.e.*, Commerce's practice of treating negative dumping margins as zero, rather than allowing them to offset positive dumping margins).  Specifically, in its reply brief, Nan Ya sought to challenge Commerce's use of zeroing in applying the agency's A-T comparison methodology in analyzing the company's U.S. sales.  *See* Pl.'s Reply Brief at 6, 9-11, 11-12, 13.  However, it is "well established that arguments not raised in the opening brief are waived."  SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006); *see also* Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (same); Audio Recording of Oral Argument at 51:25-1:01:50 (counsel for the Government arguing that claims raised for the first time in Nan Ya's reply brief are waived).  The doctrine of waiver has even greater force where, as here, it is new claims (rather than new arguments) that are at issue.

Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81

(same).  That said, the mere fact that it may be possible to draw two inconsistent conclusions

from the record does not prevent Commerce's determination from being supported by

substantial evidence.  American Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed.

Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

Commerce's statutory interpretations are evaluated under the familiar, two-step

Chevron framework.  The first step of the analysis examines "whether Congress has directly

spoken to the precise question at issue." Chevron, U.S.A., Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 842 (1984).  If so, courts must "give effect to the unambiguously

expressed intent of Congress."  Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 239

(2004) (citing Chevron, 467 U.S. at 842-43).   If instead Congress has left a "gap" for

Commerce to fill, the agency's interpretation is "given controlling weight unless [it is]

arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44; *see*

*also* Household Credit, 541 U.S. at 239.

In step two of a Chevron analysis, "[a]ny reasonable construction of the statute is a

permissible construction."  Timken v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004)

(quoting Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996)) (internal

quotation marks omitted).  "To survive judicial scrutiny, [Commerce's] construction need not

be the only reasonable interpretation or even the most reasonable interpretation . . . .  Rather,

a court must defer to an agency's reasonable interpretation of a statute even if the court might

have preferred another." Timken, 354 F.3d at 1342 (quoting Koyo Seiko Co. v. United States,

36 F.3d 1565, 1570 (Fed. Cir. 1994) (citing Zenith Radio Corp. v. United States, 437 U.S.

443, 450 (1978))) (internal quotation marks omitted).   Indeed, the Court of Appeals has

underscored that, "[i]n recognition of Commerce's expertise in the field of antidumping

investigations," Corus Staal BV v. U.S. Department of Commerce, 395 F.3d 1343, 1346 (Fed.

Cir. 2005), "[d]eference to [the] agency's statutory interpretation is at its peak in the case of a

court's review of Commerce's interpretation of the antidumping laws." Koyo Seiko, 36 F.3d

at 1570.

       Lastly, while Commerce must explain the bases for its decisions, "its explanations do

not have to be perfect." NMB Singapore, 557 F.3d at 1319-20.   Nevertheless, "the path of

Commerce's decision must be reasonably discernable" to support judicial review. *Id.* (citing

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see*

*generally* 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final

determination . . . an explanation of the basis for its determination").

## III.  Analysis

       Highlighting record evidence (as well as findings by Commerce itself) indicating that

differences in the prices that Nan Ya charged for PET film correlated with fluctuations in the

cost of inputs that Nan Ya used to produce its merchandise, Nan Ya contends, in sum and

substance, that – based on an assertedly flawed interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)

– Commerce improperly failed to consider whether the differences in Nan Ya's prices were

due to fluctuations in Nan Ya's cost of production, rather than targeted dumping.  *See*

*generally* Pl.'s Brief at 1, 2, 3-4, 14-25, 31; Pl.'s Reply Brief, *passim*; *see also* Preliminary

Results, 77 Fed. Reg. at 46,708 (finding, *inter alia*, that "the quarterly cost and quarterly sales prices for . . . Nan Ya appear to be reasonably correlated"); Def.'s Response Brief at 3 (acknowledging Commerce's finding in Preliminary Results as to relationship between Nan Ya's production costs and changes in its prices). Nan Ya characterizes its pattern of price adjustments as "rational commercial behavior" and argues that, in changing its prices, it was merely "doing what the U.S. trade laws intend a company to do in order to avoid dumping in the U.S. market – *i.e.*, adjust[ing] [the company's] prices so that [the company] sells its products in the United States at prices that are *above* [its] cost of production." Pl.'s Brief at 18; *see also id*. at 4 (similar); Pl.'s Reply Brief at 4-5 (similar). Nan Ya thus maintains that its pricing decisions did not constitute targeted dumping, and, indeed, were "the antithesis of dumping." Pl.'s Brief at 4, 24.

According to Nan Ya, even "assum[ing] arguendo that Commerce is not required as a matter of course, to investigate the reasons for observed price differences in all cases[,] . . . it . . . does not follow that Commerce is free to ignore undisputed evidence affirmatively demonstrating that the observed price differences *do not* reflect targeting behavior." Pl.'s Brief at 14-15. Nan Ya concludes that "Commerce's statutory interpretation, and its . . . failure to consider whether the observed price differences were the result of raw material cost differences, and not selective pricing, render[] its targeted dumping determination unsupported by substantial evidence and otherwise not in accordance with law." *Id*. at 15.[11]

---

[11]Nan Ya contends, among other things, that – to the extent that Commerce reads the statute not to require the agency to consider whether pricing patterns identified by the agency could be attributable to factors other than targeted dumping (such as the increased cost of raw

The Government and the Domestic Producers point to the statute itself and the absence of any text requiring Commerce to take into consideration potential causes of pricing patterns other than targeted dumping, such as the increased raw material costs that Nan Ya alleges here. *See generally* Def.'s Response Brief at 5, 14-15, 17-20, 22, 27; Def.-Ints.' Response Brief at 5-6.

The Government emphasizes that Commerce parsed the plain language of the statute in reaching the Final Results and explained in the Issues & Decision Memorandum that the "only obligations imposed" on the agency by the statute are those set forth in 19 U.S.C. § 1677f-1(d)(1)(B). Def.'s Response Brief at 18 (citing Issues & Decision Memorandum at 12); *see also* Def.-Ints.' Response Brief at 5-6. As discussed above, that provision requires Commerce (i) to determine "if there is a pattern of export prices (or constructed export prices) . . . that differ significantly among purchasers, regions, or periods of time," and – if such a pattern exists – (ii) to determine whether such differences can be accounted for through the use of a comparison methodology other than A-T. 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).

The Government and the Domestic Producers assert that both of the statutory requirements set forth in § 1677f-1(d)(1)(B) were satisfied in this instance, and that Commerce therefore properly applied its A-T methodology in reviewing Nan Ya's U.S. sales. Def.'s

---

materials at issue here) – Commerce's interpretation of the statute contravenes Congressional intent (*see* Pl.'s Brief at 4, 15-17; Pl.'s Reply Brief at 4-5, 13) and leads to absurd results. *See* Pl.'s Brief at 4, 18-19; Pl.'s Reply Brief at 4-5. Nan Ya similarly asserts that Commerce's statutory interpretation violates the agency's obligation to take into consideration evidence that "fairly detracts" from its decision (*see* Pl.'s Brief at 19-20; Pl.'s Reply Brief at 13) and cannot be reconciled with the requirement that the agency calculate dumping margins as accurately as possible. *See* Pl.'s Brief at 24-25.

Response Brief at 3-4, 14, 15-17; Def.-Ints.' Response Brief at 5-6.  The Government and the

Domestic Producers argue that, contrary to Nan Ya's claims, nothing in the statute or the

legislative history requires Commerce to consider the *causation* of any pattern of prices that

the agency may identify under § 1677f-1(d)(1)(B)(i), whatever the record evidence may show.

Def.'s Response Brief at 17, 20; *see also id*. at 5, 15, 17-20, 27; Def.-Ints.' Response Brief at

5-6.[12]

Two recent decisions from the U.S. Court of Appeals for the Federal Circuit, handed

down on the same day, confirm the correctness of Commerce's interpretation and application

---

[12]The Government explains that Nan Ya's emphasis on Preliminary Results' findings concerning the relationship between Nan Ya's production costs and its prices is misplaced. *See* Def.'s Response Brief at 25-26.  According to the Government, the referenced findings in the Preliminary Results were made in the context of Commerce's "sales below cost test," which is used to determine whether certain sales "were made at less than the cost of production" and whether "such sales may be disregarded in the determination of normal value." *Id*. at 25 (citing 19 U.S.C. § 1677b(b)).  On the other hand, "[t]he purpose of 19 U.S.C. § 1677f-1(d)(1)(B) is to determine whether the average-to-average [A-A] method is a meaningful tool to measure whether, and if so to what extent, dumping is occurring." Def.'s Response Brief at 25.

Thus, as the Government puts it, "[t]hese are two distinct tests with different aims." Def.'s Response Brief at 25.  "Commerce resorts to the average-to-transaction [A-T] method when the explicit requirements of section 1677f-1(d)(1)(B) are met because the average-to-average [A-A] method is not a proper tool for measuring dumping.  By contrast, Commerce uses the shorter cost period analysis to determine whether period average costs are the appropriate basis to determine whether comparison market sales were made at prices below the cost of production." *Id*.  The Government sums up:  "Nan Ya cannot point to any [statutory] language mandating that Commerce look to its sales below cost test in determining whether to resort to the average-to-transaction [A-T] method after finding the explicit requirements of 19 U.S.C. 1677f-1(d)(1)(B) are satisfied.  The statute imposes no such requirement." *Id*.; *see also* Issues & Decision Memorandum at 12-13 (discussing implications of finding of correlation between Nan Ya's production costs and its prices for Commerce's targeted dumping analysis).

of 19 U.S.C. § 1677f-1(d)(1)(B).   The two decisions deal directly with – and, indeed, are

dispositive of – the arguments that Nan Ya raises.

In the first of the two cases, JBF RAK, the Court of Appeals addressed whether it was

"arbitrary, capricious and an abuse of discretion [for Commerce] to refuse to consider

evidence . . . that [a] pricing pattern [identified by the agency] was not due to targeted sales

but, instead, was for *a valid business purpose*."   JBF RAK, 790 F.3d at 1368 (emphasis

added).[13]   The Court of Appeals squarely held that 19 U.S.C. § 1677f-1(d)(1)(B) does not

obligate Commerce to "determine the reasons *why* there is a pattern of export prices for

comparable merchandise that differs significantly among purchasers, regions, or time

periods." *Id*. (emphasis added).   The Court of Appeals further held that "there is no intent

requirement in the statute" and that "requiring Commerce to determine the intent of a targeted

dumping respondent 'would create a tremendous burden on Commerce that is not required or

suggested by the statute.'" *Id*. (citation omitted).

The second case, Borusan, even more closely parallels the facts here.   *See* Borusan

Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 608 F. App'x 948 (Fed. Cir. 2015).

In Borusan, the Court of Appeals considered, and flatly rejected, a claim that is virtually

_____

[13]*Compare* JBF RAK, 790 F.3d at 1368 (addressing JBF RAK's claim that its pricing pattern was for "a valid business purpose") *with* Pl.'s Brief at 17 (arguing that Nan Ya's "pricing based on rising raw material costs" is "legitimate, recognized commercial" behavior); *id*. at 18 (characterizing Nan Ya's adjustment of prices to cover changing costs as "rational commercial behavior"); *id*. at 19 (describing Nan Ya's "changing prices" as "the result of rational commercial behavior"); Pl.'s Reply Brief at 4 (asserting that Nan Ya's changing prices reflect "legitimate commercial behavior").

identical to that asserted by Nan Ya – that is, the claim that Commerce is required to evaluate

whether a pattern of prices identified by the agency in a targeted dumping analysis is "due to

*increases in raw material costs*, and not due to . . . any intentional targeted dumping scheme."

Borusan, 608 F. App'x at 949 (emphasis added).   Citing to JBF RAK and conducting a

Chevron analysis of § 1677f-1(d)(1)(B), the Borusan court held that "[n]othing in the language

of the statute requires Commerce to take the extra analytical step proposed by [the respondent

there] – [*i.e.*,] consideration of [the respondent's] alternate explanations for the pricing

patterns observed through use of the Nails test."   Borusan, 608 F. App'x at 949.

     Distilled to their essence, the Court of Appeals' holdings in JBF RAK and Borusan

establish that Commerce is under no obligation to consider evidence that factors other than

targeted dumping may account for price patterns that the agency identifies through targeted

dumping analyses.   The two Court of Appeals decisions thus render meritless Nan Ya's

attempts to impose on Commerce mandates beyond the express dictates of the statute.   Nan

Ya's challenge to Commerce's determination here therefore must fail.

## IV.  Conclusion

     For the reasons set forth above, Nan Ya's Motion for Judgment on the Agency Record

must be denied, and Commerce's determination in Polyethylene Terephthalate Film, Sheet,

and Strip From Taiwan: Final Results of Antidumping Duty Administrative Review; 2010-

2011, 78 Fed. Reg. 9668 (Feb. 11, 2013), *amended by* Polyethylene Terephthalate Film, Sheet,

and Strip From Taiwan: Notice of Correction to the Final Results of the 2010-2011

Antidumping Duty Administrative Review, 78 Fed. Reg. 14,266 (March 5, 2013), is sustained.

Court No. 13-00097                                                                    Page 24

Judgment will enter accordingly.


                                                    /s/ Delissa A. Ridgway
                                          _____
                                                   Delissa A. Ridgway
                                                         Judge

Decided:  December 31, 2015
                New York, New York